IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| S.F. § | |
| § | |
| v. § | NO. 4:23-CV-00864-ALM-BD |
| § | |
| DENTON COUNTY, TEXAS, *et al.* § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff S.F. filed a motion to strike defense expert Dr. Nicholas Longnecker, MD. Dkt. 56; *see* Dkts. 62 (response), 65 (reply), 69 (sur-reply); *see also* Dkt. 70 (response to sur-reply filed without leave of court). The motion will be granted in part and denied in part.

**BACKGROUND**

According to her operative complaint, S.F. was on deferred adjudication community supervision when the terms of her supervision were modified to recommend inpatient substance-use treatment at a residential facility called Christian Farms Treehouse. Dkt. 36 at 3. S.F. was permitted to seek immediate treatment for her addiction, which included an addiction to fentanyl, from Denton Treatment Services and then to surrender to the Denton County Jail to await transfer to Christian Farms.

At Denton Treatment Services, which offers a supervised substance-use rehabilitation program that provides medication to people with opioid-use disorder ("OUD"), S.F. was diagnosed with that disorder and prescribed methadone. That type of medication is sometimes called an "MOUD," short for medication for opioid-use disorder. Its use is also sometimes called "MAT," short for medically assisted treatment.

For approximately one week, S.F. received a daily dose of methadone until she self-surrendered to the Denton County Jail. The next day, a counselor from Denton Treatment Services emailed a copy of S.F.'s treatment plan and assessments, including her MAT dosage, to defendant John Kissinger, the Correctional Health Administrator for defendant Denton County Public Health, the

department that provides healthcare at the Denton County Jail. The counselor received no response from Kissinger, and S.F. did not receive her daily dose of methadone that day. S.F. immediately began to feel opioid withdrawal symptoms. Three days later, the counselor again emailed Kissinger, who told the counselor that the jail would not provide S.F. with methadone. S.F. remained in the Denton County Jail for three months before being transferred to Christian Farms. During that time, the jail did not provide her any methadone.

About a month after her transfer to Christian Farms, S.F. was medically discharged. But she failed to comply with a term of her supervision, so the government moved for an adjudication of guilt. She later self-surrendered to the Denton County Jail. Again, the jail did not give her methadone, and she experienced withdrawal symptoms for 12 days before she was transferred to a different facility.

S.F. sued defendants Denton County, Texas; Public Health; Matt Richardson, in his official capacity as Director of Public Health; and Kissinger in his official capacity. Dkt. 36 (operative complaint). She complains of violations of Title II of the Americans with Disabilities Act ("ADA"); the Rehabilitation Act; the Patient Protection and Affordable Care Act; the Fifth, Eighth, and Fourteenth Amendments; and article 16.22 of the Texas Code of Criminal Procedure.

The county designated Dr. Longnecker as an expert. *See* Dkt. 53 (designation); 56-2 at 19–24 (curriculum vitae and expert report). After reviewing several documents, including a Department of Justice ("DOJ") handout about the ADA, Longnecker drafted a report summarizing facts and stating several of his opinions. Dkt. 56-2 at 20–24.

In particular, Longnecker opined that (1) S.F. was not compliantly or actively on methadone at the time of either of her incarcerations, so there was no indication to the jail to provide MAT; (2) even if S.F. had been on methadone before intake, her self-reported use of illicit substances removed her ADA protection and any requirement to continue that treatment in the jail; (3) there is a grave risk of severe overdose when using both fentanyl and methadone, and that risk was another reason the jail should not have administered methadone to S.F.; (4) the jail's decision to provide medically assisted detox, rather than MAT, to S.F. during her first incarceration was

medically appropriate because she would not have been able to continue MAT once transferred to Christian Farms; (5) the jail's treatment of S.F., including its treatment of her withdrawals, during both of her incarcerations was within the acceptable standard of care; (6) the jail's treatment of S.F. was consistent with the ADA and DOJ expectations; (7) no evidence exists that the jail had a blanket policy prohibiting MAT, as reflected by the jail's administration of MAT when the appropriate conditions are met; and (8) S.F. did not suffer from severe withdrawal. S.F. asks the court to exclude or limit that testimony.

## LAW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It was amended a couple of years ago to provide:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The 2023 advisory committee note explains that the amendment was meant to (1) "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule" and (2) "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court instructed courts to serve as gatekeepers when applying Rule 702 to determine whether expert testimony should be presented to the jury. 509 U.S. 579, 589–95 (1993). Courts must "make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That "gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

Under the *Daubert* test, which examines the underlying theory on which an expert opinion is based, "[t]he proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The court's inquiry is flexible, in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

The Fifth Circuit explained several decades ago that, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). And although the 2023 advisory committee note to Rule 702 criticized unspecified judicial decisions concluding that "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," it also acknowledged that "[s]ome challenges to expert testimony will raise matters of weight rather than admissibility even under the [Federal] Rule 104(a) standard," which is less permissive than Rule 104(b). *Compare* Fed. R. Evid. 104(a) (providing that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible") *with id.* R. 104(b) (providing that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist" and that "[t]he court may admit the proposed evidence on the condition that the proof be introduced later"). In other words, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702, advisory cmte. n. to 2023 amendment.

It remains the case that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (explaining that, "[a]lthough the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does *not* judge the expert conclusions themselves"). Although "the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory cmte. n. to 2000 amendment).

## SCOPE OF REVIEW

The county argues that S.F.'s reply was untimely and should be struck. Dkt. 69 at 2. It is mistaken. The court-ordered deadline for S.F. to file her reply was January 22, 2025, Dkt. 61, and S.F. met that deadline, Dkt. 65. The court will therefore consider the reply. It will not, however, consider S.F.'s response to the county's sur-reply, which S.F. did not seek leave of court to file. Dkt. 70; *see* Loc. R. CV-7(f). That document will be struck.

In her reply, S.F. objected to two documents attached to the county's response that were created to address arguments asserted in S.F.'s motion to strike. *See* Dkt. 62 at 2, 18–27. S.F. objects to those documents as untimely but cites no authority supporting her position. The county responds that it timely satisfied Rule 26(a)(2) when it initially designated Longnecker and provided S.F. with his curriculum vitae and report. Dkt. 69 at 2. The court will consider the documents.

## DISCUSSION

### I. Longnecker's Qualifications to Provide Expert Testimony

S.F. seeks to exclude Longnecker because he is not qualified to opine on addiction medicine, the ADA, Denton County policies, and DOJ policies. Her argument fails on the first point but succeeds on the final three.

5

### A. Longnecker's qualification to opine on addiction medicine

S.F. argues that Longnecker is not qualified to offer an expert medical opinion on addiction medicine, Dkt. 56 at 1, a medical subspecialty that, according to S.F., "requires knowledge of the pharmacology and pharmacokinetics of addiction medications" and "an understanding of the neuroscience and psychiatry of addiction," *id.* at 7. She asserts that Longnecker might be qualified to talk about the administration of some medications in a correctional setting for general ailments but lacks certification or advanced training in addiction medicine and lacks training in psychiatry and addiction psychiatry. She notes that Longnecker has not published any articles or edited any scholarly journals, let alone any on addiction medicine or medications for OUD. *Id.*

The county responds that, in addition to his education, Longnecker gained experience in addiction medicine through his work at several facilities over the course of many years. Dkt. 62 at 3–5. In its view, Longnecker is qualified based on his experience, his lack of publication notwithstanding, and S.F.'s argument goes to the weight rather than the reliability of his testimony. *Id.* at 13–14.

The county has the better argument. "Rule 702 does not require a witness to publish articles or conduct research in order to qualify as an expert"; rather, "such a consideration guides the court's evaluation of the reliability of an expert's opinion, not a determination of whether he is qualified to offer expert testimony." *EEOC v. Mod. Grp., Ltd.*, 725 F. Supp. 3d 644, 663 (E.D. Tex. 2024). And Longnecker need not have "specific experience and training matched precisely to the circumstances at issue." *Id.* at 663 (collecting cases). Our neighboring court found Longnecker qualified to opine on an inmate's cause of death even though he did "not have precise experience with autopsies or determining causes of death" because of his "extensive knowledge, skill, experience, training, and education in healthcare — specifically, as a correctional healthcare professional." *Douglas v. Potter County*, No. 2:24-CV-030-Z-BR, 2025 WL 824582, at *4–5 (N.D. Tex. Mar. 13, 2025).

As relevant here, Longnecker has years of experience treating addiction, overseeing MAT, and treating inmates. According to his declaration, Longnecker worked at Greenbriar Treatment

6

Center and the Washington County Jail for two years. Dkt. 62 at 20. He evaluated and treated patients suffering from addiction there. And at the Washington County Jail, he managed patients with addiction disorders. For the next six-and-a-half years, he worked at the University of Pittsburgh Medical Center, where he regularly treated patients suffering from addiction and managed their addiction medications. For a year-and-a-half after that, he worked at WellPath, where he oversaw the MAT program for Albion Prison. And since 2022, he has worked at CorrHealth, where he is responsible for directing inmate medical care. He also developed and manages its MAT program for sites across four States.

Other physicians have been deemed qualified on addiction medicine without having specific experience and training matched precisely to the circumstances at issue in the cases at hand. For example, this court found another physician qualified to opine on the use of methadone and the interaction between it and Xanax because he specialized in addiction medicine, treated patients with substance-use disorders, and regularly prescribed opioids. *Mod. Grp., Ltd.*, 725 F. Supp. 3d at 663. The court did not demand that the physician prescribe methadone for the treatment of addiction, regularly prescribe Xanax, work in an opioid treatment program, or personally observe the effects of both medications. *Id.* at 662–64.

Likewise, in *Johnson v. Dart*, the Northern District of Illinois found a physician qualified "to discuss the standard of care for health workers and [opioid-treatment programs] in the correctional setting" because he was licensed to practice in California, had taken and passed the National Commission on Correctional Health Care examination to become a Certified Correctional Healthcare Professional, and had over 20 years of experience working as a doctor in correctional settings. No. 16 CV 144, 2020 WL 8255194, at *3, 8 (Dec. 18, 2020), *report and recommendation adopted,* No. 16 C 144, 2021 WL 12302695 (Feb. 18, 2021). The court rejected the plaintiff's argument that the physician was unqualified because he was not board certified in addiction medicine, stating that board certification was not necessary and that he was qualified based on his years of experience treating inmates struggling with addiction issues. *Id.* at *8.

Similarly, in *Adams v. Hooper*, the Northern District of Alabama determined that a physician was "qualified to provide an expert opinion on the standard of care in methadone maintenance" because he was "trained in methadone maintenance during his residency" and "helped design and set up a methadone maintenance clinic." No. 7:12-CV-1942-LSC, 2013 WL 5777032, at *3 (Oct. 25, 2013). "As part of that work, he prepared written protocols for increasing methadone dosages." *Id.* He also "gave a presentation entitled 'A Forensic Approach to Death in Methadone Treatment' to the American College of Forensic Psychiatrists." *Id.* Although the defendant argued that the physician was unqualified based on his lack of recent experience in methadone maintenance, the court rejected that argument, finding that he had "knowledge of methadone maintenance, education in methadone maintenance, and training in methadone maintenance." *Id.* He also had "more recent experience prescribing methadone to patients." *Id.* The court added that the defendant could "adequately expose any deficiencies in [the physician's] qualifications, such as his lack of more recent experience in methadone maintenance, to the fact finder through cross examination." *Id.*

Longnecker is likewise qualified to opine on addiction medicine. S.F. can pursue any deficiencies in his qualifications at trial. *See* Fed. R. Evid. 702, advisory cmte. n. to 2023 amendment; *Daubert*, 509 U.S. at 596.

### B. Improper topics of expert testimony

#### 1. The ADA

S.F. argues that Longnecker is not qualified to testify as to his legal conclusions about whether illicit substance abuse removes ADA protection. Dkt. 56 at 10–11. The county responds that Longnecker is qualified to draw that conclusion because he cited DOJ guidance and because he is experienced both in determining whether to offer MAT for OUD in a correctional setting and in drafting policies and procedures addressing that issue. Dkt. 62 at 5–7. The county adds that Longnecker also regularly encounters inmate-patients who need ADA accommodations.

S.F. is correct on this point. "[A]n expert may never render conclusions of law," *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009), so Longnecker's conclusions about the

8

requirements of the ADA should be struck, *Mod. Grp., Ltd.*, 725 F. Supp. 3d at 691–92 (striking expert opinions offering legal conclusions as to what the ADA requires); *EEOC v. MJC, Inc.*, No. 17-00371 SOM-WRP, 2019 WL 2992013, at *3–4 (D. Haw. July 9, 2019) (same); *Nat'l Ass'n of the Deaf v. Dist. Hosp. Partners, L.P.*, No. CV 14-1122 (RC), 2016 WL 447444, at *3 (D.D.C. Feb. 4, 2016) (same).

### 2. County policies

S.F. argues that Longnecker is not qualified to testify that the Denton County Jail does not have a blanket policy prohibiting MAT. Dkt. 56 at 11–12. She says that the record does not show that Longnecker has worked at the jail, that his employer has performed services there, or that he has reviewed the jail's or Public Health's policies. In response, the county argues that Longnecker's opinions about the jail policies are based on his review of materials, including all of the documents that S.F. produced, showing that the jail did administer MAT in some clinically warranted situations. Dkt. 62 at 7–8.

The entirety of Longnecker's opinion about the jail's policies reads as follows: "[N]o evidence exists that the Denton County Jail had a blanket policy prohibiting MAT. Conversely, there is evidence of MAT administration at the jail when the appropriate condition(s) were met (i.e. pregnancy)." Dkt. 56-2 at 24. That is not proper expert testimony. *See Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 WL 1319553, at *9–10 (E.D. Tex. Apr. 10, 2017) (collecting cases). The jury does not need expert testimony to determine what evidence is in the record when it "can easily reach reliable conclusions based on common sense, common experience, and [jurors'] own perceptions." *Id.* at *9 (quoting 29 Charles Alan Wright, Federal Practice and Procedure § 6265.2 (2d ed. Supp. 2025)); *see* Fed. R. Evid. 702(a) (requiring expert testimony to "help the trier of fact to understand the evidence or to determine a fact in issue").

### 3. DOJ policies

S.F. argues that, in the absence of any evidence or training showing otherwise, Longnecker is not qualified to opine as an expert that the jail provided treatment consistent with DOJ policies. *Id.* at 12–13. The county responds that Longnecker is qualified to opine on those policies because of

9

his experience treating people with addiction and developing and managing a MAT program in a correctional setting. It adds that S.F.'s arguments go to the weight and not the admissibility of his opinions.

Longnecker stated that the jail's treatment of S.F. was "consistent with ... DOJ expectations." Dkt. 56-2 at 24. He did not, however, specify what expectations he had in mind. And his report mentioned only one DOJ report: a document that "provides informal guidance" to the public, the contents of which "do not have the force and effect of law and are not meant to bind the public in any way." DOJ Civil Rights Division, *The Americans with Disabilities Act and the Opioid Crisis: Combating Discrimination Against People in Treatment or Recovery*, https://archive.ada.gov/opioid_guidance.pdf.

The jury does not need an expert to opine on a document that was drafted for the public. *See* Fed. R. Evid. 702(a). And if Longnecker meant to convey his opinion that, based on his understanding of the ADA's requirements described in that document, the jail complied with the ADA, he was expressing a prohibited legal conclusion. *See Goodman*, 571 F.3d at 399.

## II. Relevance

S.F. argues that Longnecker's testimony about whether the jail treated her withdrawals is irrelevant. Dkt. 56 at 5–6. In her view, the issue is whether the jail treated her alleged disability—that is, her OUD—as opposed to her withdrawal symptoms. The county responds that Longnecker does not opine that withdrawal is a disability but instead that illicit drug use excluded S.F. from ADA protection, that she received reasonable medical treatment at the Denton County jail, and that her MAT prescription could not be verified. Dkt. 62 at 10.

As already noted, Longnecker cannot properly opine on the contours of the ADA's protection. But he can properly opine on the other points.

To succeed on her § 1983 claim, S.F. must show deliberate indifference as to her constitutional right to medical care. *See, e.g.*, *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019) (stating that a pretrial detainee has a right to medical care); *Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010) (explaining that a "plaintiff must demonstrate that a municipal decision reflects deliberate

indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision" (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)). Longnecker's opinion about whether it was medically reasonable for S.F. to be treated for her withdrawals rather than being given MAT is relevant to that showing. Whether S.F. was "compliantly or actively on MAT at the time of incarceration," Dkt. 56-2 at 23, informed that opinion and is therefore relevant.

### III. Reliability

S.F. argues that Longnecker's opinions regarding county policies and the applicable standard of care are unreliable. Her argument succeeds on the first point but fails on the second.

#### A. County policies

S.F. argues that Longnecker's opinion about the county's policies is unreliable because it is not based on any instances of the jail actually providing MAT. As already noted, the county refutes that assertion based on Longnecker's review of county records.

But even if Longnecker reached his conclusions about the county's policies after reviewing relevant records, he does not identify which facts in the record he relied on or what method he used to reach his conclusion. *See* Fed. R. Evid. 702(b) (requiring expert testimony to be "based on sufficient facts or data"). In addition to being beyond the scope of proper expert testimony, *see supra* Part I.B.2, that part of Longnecker's opinion should also be excluded on reliability grounds.

#### B. Standard of care

S.F. argues that the scientific and medical community regards methadone, buprenorphine, or naltrexone as the standard of care for treating OUD. Dkt. 56 at 8. In her view, Longnecker's opinion that forced withdrawal, followed by treatment of withdrawal symptoms, constitutes effective treatment for Opioid Use Disorder "is so far outside the established medical community as to be unreliable, unsupportable, and viewed with extreme skepticism." *Id.* at 9. She cites sources supporting that view and asserts that Longnecker's contrary opinion has not been subject to peer review or published.

11

The county argues that the evidence does not establish that S.F. was on methadone before either of her two incarcerations and that it does establish that she was illicitly using controlled substances before incarceration. Dkt. 62 at 11. It adds that Longnecker did not opine that treating the withdrawals is the standard of care for treating OUD. According to the county, Longnecker said that medical withdrawal is appropriate for a person who is actively abusing drugs and not on MAT. The county also faults the sources that S.F. cites because they do not address treatment in a correctional setting.

In reply, S.F. points out that Longnecker failed to consider an email in the record showing that Kissinger knew S.F. was participating in MAT immediately before her first incarceration. Dkt. 65 at 2–3. The county responds that the email does not "show evidence of any dose of Methadone provided to Plaintiff or otherwise establish that she had actually beg[un] receiving MAT therapy." Dkt. 69 at 3.

The county has the better argument. Longnecker states that, because S.F. admitted to ongoing illicit-substance abuse and did not mention being on MAT, he believed that S.F. was not "compliantly and actively on MAT" and that "there was no indication for MAT administration during" either of her incarcerations. Dkt. 56-2 at 22–23. Longnecker opined that, instead of MAT, "medically assisted withdrawal treatment with close monitoring" was within the acceptable standard of care. *Id.* at 23–24.

Longnecker does not opine, as S.F. argues, that forced withdrawal would be within the acceptable medical standard of care in all circumstances. And even if he did, S.F.'s argument that Longnecker's opinion is "far outside the established medical community," Dkt. 56 at 9, would still fail. The "general acceptance" factor from *Daubert* questions whether a theory or technique is reliable. *Daubert*, 509 U.S. at 594. "A proponent need not prove to the judge that the expert's testimony is correct," but only that it is based on reliable methods. *Moore*, 151 F.3d at 276. That means that it does not matter, at this stage, whether Longnecker is correct in finding forced withdraw reasonable. What matters is how he reached that conclusion, and his report makes that

12

sufficiently clear. If S.F. disagrees with Longnecker, she may try to convince the jury of her view through cross-examination.

As to the sufficiency of the facts and data supporting Longnecker's opinion, the county again has the better argument. Regardless of the email to Kissinger or S.F.'s alleged failure to mention MAT treatment at intake, Longnecker supported his opinion that MAT was not appropriate during S.F.'s first incarceration with sufficient facts and data. He opined that it was medically appropriate to provide "medically-assisted detox" because S.F. would not have been able to continue MAT after her transfer to Christian Farms, a facility that does not provide MAT. Dkt. 56-2 at 23. Further, Longnecker cited the "grave risk of severe overdose when using both fentanyl and methadone" as another reason the jail should not have administered methadone. Dkt. 56-2 at 22. That is enough for the matter to go to the jury.

## IV. Unchallenged Opinions

A district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That leeway allows the court, acting "within its discretionary gatekeeper role," to consider sua sponte whether expert testimony should be excluded. *Doucette v. Jacobs*, 106 F.4th 156, 171 (1st Cir. 2024). Here, the court will consider two topics of expert opinion to which S.F. did not object.

The first is Longnecker's opinion that, because using both fentanyl and methadone creates a serious risk of overdose, the jail should not have administered methadone under the acceptable standard of care. Longnecker's experience qualifies him to testify about the risks of mixing those substances and whether it was within the reasonable standard of care for the jail not to provide MAT if it was aware of that risk. The court sees no reason to find that testimony unreliable. But as already noted, Longnecker may not opine on whether that risk affected the jail's legal responsibilities to S.F. under the ADA.

The second topic is Longnecker's opinion about the severity of S.F.'s withdrawal symptoms. *See* Dkt. 56-2 at 24. Longnecker's education and experience qualify him to opine on that topic. And

13

the court sees no reason to find that category of his testimony unreliable or otherwise inadmissible. *See United States v. Dixon*, 185 F.3d 393, 400 (5th Cir. 1999).

## CONCLUSION

It is **ORDERED** that S.F.'s response, Dkt. 70, to the county's sur-reply is **STRUCK**.

It is **FURTHER ORDERED** that S.F.'s motion to strike, Dkt. 56, is **GRANTED** in part and **DENIED** in part. Longnecker may not offer expert testimony on whether (1) S.F.'s self-reported use of illicit substances removed her from the ADA's protection; (2) the jail had any legal obligation to continue MAT; (3) the jail's treatment of S.F. was consistent with ADA and DOJ expectations; (4) evidence exists that the jail either had a blanket policy prohibiting MAT or had administered MAT when the appropriate conditions were met.

Longnecker may, however, opine on (1) whether S.F. was compliantly or actively on methadone at the time of either of her two incarcerations and, if she was not, whether MAT was appropriate; (2) whether there is a grave risk of severe overdose when using both fentanyl and methadone and whether that risk was another reason the jail should not have administered methadone to S.F. under the acceptable standard of care; (3) whether the jail's decision to provide medically assisted detox, rather than MAT, to S.F. during her first incarceration was medically appropriate, considering that S.F. would not have been able to continue MAT once transferred to Christian Farms; (4) whether the jail's treatment of S.F. during both incarcerations, including its treatment of her withdrawals, was within the acceptable standard of care; and (5) the severity of S.F.'s withdrawal.

So **ORDERED** and **SIGNED** this 27th day of May, 2025.

_____
Bill Davis
United States Magistrate Judge